FILED
U.S. DISTRICT COURT
INDIANAPOLIS DIVISION

13 SEP 23 PM 3: 48

SOUTHERN DISTRICT
OF INDIANA
LAURA A. BRIGGS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

UNITED STATES OF AMERICA )
) No. _____
v. )
) 1:13-cr-0200 WTL-TAB
DONALD JOHN SACHTLEBEN, )
)
Defendant. )

## STATEMENT OF OFFENSE

Should this matter proceed to trial, the United States of America would prove the following facts beyond a reasonable doubt:

### Introduction

1. On or about May 2, 2012, the defendant DONALD JOHN SACHTLEBEN ("SACHTLEBEN"), having authorized access to national defense information relating to a disrupted suicide bomb attack on a U.S.-bound airliner by the Yemen-based terrorist organization Al-Qaeda in the Arabian Peninsula ("AQAP") and the recovery by the United States of a bomb in connection with that plot in April 2012 (referred to hereinafter as "the bomb"), willfully disclosed such national defense information to a person not entitled to receive it, namely a reporter with a national news organization ("Reporter A"). At the time of his unauthorized disclosure, SACHTLEBEN had reason to believe that his unauthorized disclosure of such national defense information could be used to the injury of the United States or to the advantage of a foreign nation. In or about May 2012, SACHTLEBEN also willfully possessed and retained national defense information in his residence in Carmel, Indiana, including an intelligence report classified at the SECRET level that remains so classified to this day.

### Defendant's Background

2. SACHTLEBEN was employed by the Federal Bureau of Investigation ("FBI") from in or about 1983 through in or about 2008. In the course of his career, SACHTLEBEN was a Special Agent Bomb Technician assigned to many FBI Major Cases involving terrorist attacks, including the Oklahoma City bombing, the first World Trade Center bombing, the Unabomber attacks, the United States Embassy bombings in East Africa, the U.S.S. COLE bombing, and the attacks of September 11, 2001. Among other assignments, SACHTLEBEN was assigned to the Explosives Unit at the FBI Laboratory in Quantico, Virginia ("FBI Lab"). SACHTLEBEN held a TOP SECRET security clearance as an FBI employee on account of his official responsibilities at the FBI. As a result, SACHTLEBEN had regular access to classified and national defense information relating to the FBI's activities, as well as the activities of other members of the United States Intelligence Community.

3. In or about 2008, SACHTLEBEN retired from the FBI and was rehired as a contractor. SACHTLEBEN maintained his TOP SECRET security clearance as an FBI contractor on account of his official responsibilities at the FBI. As a result, SACHTLEBEN continued to have regular access to classified and national defense information relating to the FBI's activities, as well as the activities of other members of the United States Intelligence Community. As a contractor, SACHTLEBEN routinely visited the FBI Lab. SACHTLEBEN was employed as an FBI contractor until on or about May 11, 2012.

4. Beginning in or about 1983, in connection with the start of his employment with the FBI, SACHTLEBEN entered into various non-disclosure agreements with the United States, obligating him not to disclose national defense information to any unauthorized person and advising him that any such unauthorized disclosure could constitute a violation of United States

criminal laws, including Title 18, United States Code, Section 793. SACHTLEBEN entered into such non-disclosure agreements both as an FBI employee and as an FBI contractor. The scope of these non-disclosure agreements encompasses the national defense information referenced in this Statement of Offense.

### Defendant's Relationship with Reporter A

5. Beginning in or about the fall of 2009, SACHTLEBEN developed a source-reporter relationship with Reporter A. Their source-reporter relationship initially focused on SACHTLEBEN's contract work on the FBI's National Improvised Explosives Familiarization ("NIEF") training program. Their source-reporter relationship quickly developed into other areas beyond the NIEF program. For example, from in or about January 2010 through in or about May 2012, in emails, text messages, and conversations, SACHTLEBEN provided Reporter A with information about explosives used in terrorist plots or attacks and the FBI's analysis of such explosives. While doing so, SACHTLEBEN repeatedly requested Reporter A to keep his true identity and his relationship with Reporter A protected and confidential. When discussing in an email exchange how to refer to SACHTLEBEN as an anonymous source for an article to be published, SACHTLEBEN asked Reporter A not refer to him as a contractor because there was a "[p]retty small number of us." (The emails and text messages between SACHTLEBEN and Reporter A referenced in this Statement of Offense were obtained from SACHTLEBEN's electronic devices).

### Defendant's Unauthorized Disclosure of National Defense Information

6. On or about April 30, 2012, following the disruption of a suicide bomb attack on a U.S.-bound airliner by AQAP and the recovery by the United States of a bomb in connection with that plot, the bomb arrived at the FBI Lab for forensic analysis.

7. On or about April 30, 2012, at approximately 6:30 p.m., ABC World News Tonight broadcast a news story which stated, in part, that for the past year United States and European officials had warned that AQAP's master bomb-maker, Ibrahim al-Asiri, had been designing surgically implanted body bombs to get past airport security, and that there was concern that AQAP may soon try to explode a U.S.-bound aircraft with explosives hidden inside the bodies of terrorists.

8. On or about April 30, 2012, later that evening, beginning at approximately 7:14 p.m., SACHTLEBEN and Reporter A exchanged text messages about al-Asiri and Reporter A's speculation about the FBI's recovery of a surgically implanted body bomb (also known as a "cavity bomb"). (Note: the bomb referenced in Paragraph 6 above was not a surgically implanted body bomb or cavity bomb.) These text messages were as follows:

| Date | Time | Originating Cellular Phone | Terminating Cellular Phone | Content of Text Message |
| --- | --- | --- | --- | --- |
| 4/30/2012 | 7:14 p.m. | Reporter A | SACHTLEBEN | Al-Asiri is up to his old tricks. I wonder if ur boys got a hold of a cavity bomb |
| 4/30/2012 | 7:14 p.m. | Reporter A | SACHTLEBEN | :) |
| 4/30/2012 | 7:15 p.m. | SACHTLEBEN | Reporter A | Yikes. Remind me to bring sum purell to the lab |
| 4/30/2012 | 7:16 p.m. | Reporter A | SACHTLEBEN | Not totally sure though |

9. On or about May 1, 2012, beginning at approximately 9:48 a.m., SACHTLEBEN and Reporter A exchanged two more text messages. These text messages were as follows:

| Date | Time | Originating Cellular Phone | Terminating Cellular Phone | Content of Text Message |
| --- | --- | --- | --- | --- |
| 5/1/2012 | 9:48 a.m. | SACHTLEBEN | Reporter A | Hmm. Methinks the 10am news conf may be related |
| 5/1/2012 | 9:51 a.m. | Reporter A | SACHTLEBEN | Ah! |

10. On or about May 1, 2012, at approximately 10:00 a.m., the FBI held a news conference concerning the arrest of five men in Cleveland, Ohio, who were charged with plotting a bomb attack on a bridge in Ohio. This FBI news conference had nothing to do with the bomb referenced in Paragraph 6 above.

11. On or about May 1, 2012, just prior to departing from the Indianapolis airport and upon landing at the Washington-Dulles airport for a previously planned trip to the FBI Lab the following day (i.e., May 2, 2012), SACHTLEBEN sent two more text messages to Reporter A. These texts were as follows:

| Date | Time | Originating Cellular Phone | Terminating Cellular Phone | Content of Text Message |
|---|---|---|---|---|
| 5/1/2012 | 9:52 a.m. | SACHTLEBEN | Reporter A | Just abt to take off. Will b curious to c coverage when i land at dulles. Hope that tsa doesnt get out the rubber gloves and ky |
| 5/1/2012 | 12:49 p.m. | SACHTLEBEN | Reporter A | Got that one wrong. A lil surprised they r wrkin 24 hr shifts cuz of those mutts. **Still mght b sumthin else brewin. Will find out tomorrow** (Emphasis added.) |

12. On or about May 2, 2012, at approximately 8:39 a.m., SACHTLEBEN used his FBI-issued badge to enter the FBI Lab. Among other things, SACHTLEBEN logged into the FBI's classified computer system from a computer terminal located within the FBI Lab in an administrative space designated for the Explosives Unit. That administrative space was directly across the hallway from the examination space for the Explosives Unit, where the bomb was then being examined. SACHTLEBEN also used his FBI-issued badge to enter the examination space for the Explosives Unit. SACHTLEBEN did not access any documents on the FBI's classified computer system about the bomb and did not sign the sign-in sheet for access to a specific room

within the examination space for the Explosives Unit designated for the examination of the bomb.

13. On or about May 2, 2012, at approximately 10:25 a.m., SACHTLEBEN called Reporter A and spoke with him for a little over two minutes. In that call, SACHTLEBEN disclosed to Reporter A national defense information that he had gathered that morning, including that the FBI was then engaged in an ongoing, secretive, and sensitive analysis of the bomb; analysis which involved other parts of the United States Government besides the FBI. At that time, SACHTLEBEN believed that the national defense information that he disclosed to Reporter A was classified at least at the SECRET level.

14. Approximately two-and-a-half hours later, Reporter A and another reporter from Reporter A's news organization contacted multiple United States Government officials and stated that they knew the following facts: (1) the United States had intercepted a bomb from Yemen; (2) the FBI was analyzing the bomb; and (3) they believed, but had not confirmed, that the bomb was linked to AQAP's premier bomb-maker, Ibrahim al-Asiri. The facts that these reporters stated that they knew as of May 2, 2012 (namely, (1) and (2) in the immediately preceding sentence) constituted classified and national defense information as of that date.

15. Beginning on May 7, 2012, multiple news organizations published articles about the disrupted suicide bomb attack and recovery of the bomb. The lead article was published by Reporter A's news organization on May 7, 2012, at approximately 4 p.m., and was entitled, "US: CIA Thwarts New al-Qaida Underwear Bomb Plot." Thereafter, Reporter A's news organization and other news organizations published additional articles and/or broadcast television reports about the disrupted suicide bomb attack and recovery of the bomb (referred to collectively hereinafter as the "Media Reports").

16. Following the publication of the Media Reports, SACHTLEBEN continued to provide information to Reporter A about the bomb.

17. SACHTLEBEN was never authorized, directly or indirectly, by the United States Government to deliver, communicate, or transmit any classified or national defense information to Reporter A or any other member of the media.

## Defendant's Unauthorized Possession and Retention of National Defense Information

18. From a date uncertain to on or about July 9, 2013, SACHTLEBEN willfully possessed and retained in his residence in Carmel, Indiana, on numerous pieces of electronic media, United States Government documents bearing classification markings in their headers or footers or in their individually classified paragraph portion markings. The majority of these documents bore SECRET classification markings.

19. From a date uncertain to in or about May 2012, SACHTLEBEN willfully possessed and retained in his residence in Carmel, Indiana, a CD/DVD containing, among other things, a Central Intelligence Agency ("CIA") intelligence report, bearing a "SECRET//NOFORN" classification marking and the date November 2, 2006. The CIA has conducted a formal classification review of that intelligence report and determined that the report was and remains properly marked at the SECRET//NOFORN classification level. The CD/DVD was seized in or about May 2012, in connection with an unrelated criminal investigation of SACHTLEBEN involving his possession and distribution of child pornography.

20. "Classified" information is defined by Executive Order 13526 ("Executive Order") as information in any form that: (1) is owned by, produced by or for, or under control of the United States Government; (2) falls within one or more of the categories set forth in the Executive Order; and (3) is classified by an original classification authority who determines that its

unauthorized disclosure reasonably could be expected to result in damage to the national security which includes defense against transnational terrorism. Where such unauthorized disclosure reasonably could be expected to cause "exceptionally grave damage" to the national security, the information is classified as "TOP SECRET." Where such unauthorized disclosure reasonably could be expected to cause "serious damage" to the national security, the information is classified as "SECRET." Where such unauthorized disclosure reasonably could be expected to cause "damage" to the national security, the information is classified as "CONFIDENTIAL." The designation "NOFORN" means that a classified document cannot be shared with any foreign nationals or foreign governments.

## Conclusion

21. SACHTLEBEN engaged in the conduct described above knowingly and willfully, and not by accident, mistake, or any other innocent reason. In disclosing information to Reporter A, SACHTLEBEN did not believe that he was exposing government waste, fraud, abuse, or any other kind of government malfeasance or misfeasance.

This Statement of Offense is not intended to be a complete recitation of all of the facts known to the United States or SACHTLEBEN, but is, instead, intended to provide a sufficient factual basis for the defendant's plea of guilty to one count of Unauthorized Disclosure of National Defense Information, in violation of 18 U.S.C. § 793(d), and one count of Unauthorized Possession and Retention of National Defense Information, in violation of 18 U.S.C. § 793(e).

Respectfully submitted,

JOSEPH H. HOGSETT
United States Attorney for the
Southern District of Indiana

Steven D. DeBrota
Senior Litigation Counsel

RONALD C. MACHEN JR.
United States Attorney for the District of
Columbia

Jonathan M. Malis
G. Michael Harvey
Assistant United States Attorneys

Richard S. Scott
Department of Justice Trial Attorney

## DEFENDANT'S ACCEPTANCE

I have read every word of this Statement of Offense. Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, and after consulting with my attorneys, I agree and stipulate to this Statement of Offense, and declare under penalty of perjury that it is true and correct.

Date: 9/19/2013

_____
Donald John Sachtleben
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have discussed this Statement of Offense with my client, Donald John Sachtleben, and concur with his decision to stipulate to this Statement of Offense.

Date: 9/19/2013

_____
Larry A. Mackey/James R. Sweeney, II
Attorneys for Donald John Sachtleben